James A. BARNARD, Plaintiff,

v.

JACKSON COUNTY, MISSOURI,
et al., Defendants.

No. 90–0988–CV–W–6.

United States District Court,
W.D. Missouri, W.D.

Oct. 12, 1993.

Steven L. Hobson, Ronald J. Stites, Stites, McIntosh & Knepper, Kansas City, MO, for James A. Barnard.

Jay D. Haden, Russell D. Jacobson, J. Earlene Farr, Margaret M. Korth, F. Russell Millin, Millin & Trader, Thomas F. Gordon, Gordon & Gordon, P.C., Kansas City, MO, for defendants.

### *MODIFIED MEMORANDUM AND ORDER*

SACHS, Senior District Judge.

Plaintiff Barnard served as legislative auditor for the County Legislature of Jackson County, Missouri, from 1985 until his removal by the Legislature in August 1990. His removal was voted by the seven defendant members of the Legislature who were present; six votes out of nine were needed under the County Charter. Plaintiff sues the voting members of the Legislature and the County, alleging a violation of 42 U.S.C. § 1983, in that his First Amendment rights to communicate matters of public concern to the Federal Bureau of Investigation and the editorial board of the Kansas City Star were allegedly violated. It is claimed the removal was in retaliation for such communications.

After discovery, defendants move for summary judgment. In ruling the motion the court gives plaintiff the benefit of the doubt on all material disputed facts. Pertinent material facts that are not in dispute are set forth below and in the analytical portions of this opinion.

Plaintiff's theory of the case is that the contested discussions were with (1) the FBI concerning allegations that defendant Carol Coe (then a member of the Legislature) had solicited for a bribe while a legislator; and (2) members of the press about various audits of county departments, offices, officers and contractors before the audits were presented to the Legislature in final form. Only the timing of plaintiff's discussions with the press was in controversy when the termination occurred. Plaintiff's Memorandum in Opposition (Doc. 145), p. 9.

After audits are presented to the Legislature they are filed and made available to the public, including the news media. The 1990 audits discussed with the editorial board included one on the Jackson County Sports Authority, in January 1990, which suggested a possible conflict of interest or "the potential for a conflict of interest" by appointed members of the Authority. The Legislature had passed a resolution "expressing concern" over the plaintiff's suggestion. A second audit discussed with the editorial board in May or early June 1990 related to the Medical Examiner's Office. This audit was later presented to the Finance and Audit Committee of the Legislature, chaired by defendant Growney, on June 29, 1990, and thereafter made public. Neither party characterizes the specific content of that audit in briefing to the court.

Between the two 1990 audits that were a subject of legislative concern, the Legislature met in executive session with plaintiff on May 7, 1990, to discuss his job performance. On April 27, 1990, plaintiff had been presented with "Communication Guidelines Pertaining to Legislative Auditor," prepared by defendant Growney and the County Counselor. Plaintiff said he had no problem with the guidelines. He now contends the guidelines given him were unduly restrictive, under State law and the First Amendment. He correctly contends they would prevent him from having any contacts with the press about his investigations and audits before they were presented to the Legislature in final form.

Plaintiff contends that at the May 7, 1990, job performance review some members of the County Legislature appeared to be angry about his FBI contacts, which continued until that meeting. The questions about defendant Coe were publicly aired in 1987, but she apparently had no confirmation of plaintiff's role with the FBI until 1990.

Further factual review will be reserved for discussion of the two subjects of First Amendment controversy.

### Communications to the FBI

█ Plaintiff has apparently served as a self-appointed informant to the Federal Bureau of Investigation regarding what he believes to be law violations within the County

Government. He contends that he has proof that at least three members of the County Legislature voted to terminate his services, at least in part, because they resented his whistle-blowing activity. Defendants Tindall, Coe and Waits have been identified as critics of this practice.

Whether or not plaintiff's judgment about criminality was sound is not in issue; presumably the FBI and the United States Attorney would be capable of evaluating his information. It seems rather well settled, however, that private communications in the nature of whistle-blowing are entitled to First Amendment protection from governmental discipline or retaliation, and that any such retaliation against plaintiff for going to the FBI would violate plaintiff's federally protected employment rights. *Monsanto v. Quinn*, 674 F.2d 990, 994, 996 (3rd Cir.1982); *Brown v. Texas A & M University*, 804 F.2d 327, 337–8 (5th Cir.1986); *Roth v. Veteran's Administration*, 856 F.2d 1401, 1404–8 (9th Cir.1988).

In reviewing an issue of this nature on a motion for summary judgment, lack of causation of injury may require judgment for a defendant. *O'Connor v. Chicago Transit Authority*, 985 F.2d 1362 (7th Cir.1993). No matter how hostile one or more members of the County Legislature may have been, as a result of plaintiff's informing the FBI, there is no evidence that two-thirds of the members of the County Legislature (or even a simple majority) were adversely motivated by reason of plaintiff's FBI contacts, and thus there is no factual basis for a trier to conclude that such hostility may have caused plaintiff's termination.[1]

Without weighing the evidence, it is noted, moreover, that the FBI issue centered on defendant Coe, according to plaintiff, the issue was so stale by 1990 that it could hardly have changed any votes, and some of the criticism of plaintiff that related to the FBI whistle-blowing was voiced by legislators like defendant Coe, who had been opposed to plaintiff's appointment in the first place. Insufficient evidence of causation mandates a ruling for defendants on the FBI issue.

## Premature Discussions of Audits with Star Editorial Board

Whether the audit material discussed by plaintiff with the Star editorial board concerned matters of "public concern" is a somewhat elusive concept. The material relating to the Medical Examiner's Office has not been shown to be the sort of information on corruption, abuse of power, waste or mismanagement that cries out for public attention, and has been declared to be public interest material. *See Jurgensen v. Fairfax County, Va.*, 745 F.2d 868, 872 (4th Cir.1984). It is more like an inspection report or typical internal governmental study, deemed by two of the *Jurgensen* judges to be lacking inherent public concern status. 745 F.2d at 890–1 (Ervin, J., concurring). The contrary views of the district judge and the dissenting judge in that case make it obvious that a ruling on what is of "public concern" is fraught with difficulty, particularly in a case like this, where an editorial board of a major newspaper gave plaintiff a hearing, despite the arguably routine nature of much of the work. *See also O'Connor v. Steeves*, 994 F.2d 905, 913 (1st Cir.1993), collecting cases showing "various approaches" to the inquiry about public-concern material.

 I have concluded that it is easier to decide the case by assuming arguendo that there were matters of public concern in plaintiff's audit material. Even so, under Judge Russell's opinion for himself alone in *Jurgensen*, disciplinary action can be properly based on insubordinate release of the material. Restrictions on indiscriminate release of governmental information by employees, removal of records and the like, have occasionally been referred to as possibly justifying discipline. *Hubbard v. Environmental Protection Agency*, 949 F.2d 453, 459–60 (D.C.Cir.1991); *Matlock v. Town of Harrah, Okl.*, 719 F.Supp. 1523, 1530 (W.D.Okl.1989). The insubordination factor relied on by Judge Russell has been a suggested consideration at least since *Connick v. Myers*, 461 U.S. 138, 153, 103 S.Ct. 1684, 1693, 75 L.Ed.2d 708 (1983). In many circumstances

---

1. Defendants Arbanas and Hertzog testified by deposition that they favored plaintiff's access to the FBI; defendants Growney and Smith cannot be identified as opponents of the practice.

use of such procedural restrictions may be questionable or may be a pretext, but in the present case I find nothing questionable or pretextual in defendants' conduct.[2]

This case is unlike almost all litigated cases in that it is only the timing of news media contact that was challenged by defendants. Once the audit was presented to the Legislature and became a matter of public record, defendants had no objection to plaintiff's defending or otherwise discussing the audit with the media. Defendant Growney, the most directly involved, testified that plaintiff "absolutely" had the right to discuss audits with the press after delivery to the Legislature; there is no basis to conclude and plaintiff does not contend that other defendants sought to impose a more restrictive policy. Plaintiff tacitly or expressly agreed not to engage in what defendants considered to be premature disclosure. He then violated the directive of the Finance and Audit Committee. The depositions make clear that Growney and others considered this to be serious misconduct, probably fatal to an already difficult employment relationship.[3]

Plaintiff contends defendants could not adopt a "chain of command" policy, suppressing information that is a matter of public concern. *Czurlanis v. Albanese,* 721 F.2d 98, 105–6 (3rd Cir.1983). Unlike *Czurlanis,* however, this case does not require the court to consider whether plaintiff could have been permanently "muzzled," under an ironclad policy against leakage of information. Only a delay of several weeks, under the facts of this case, was contemplated.

While short-term prior restraints are highly questionable in some areas of First Amendment law there is no authority cited or found by the court which would generally prohibit some channeling of information to an employee's superiors prior to making a public release of information.[4] The absence of litigation suggests to me that few government employees would assert a constitutional "right to leak." Plaintiff asserts as justification for his conduct that he wished to get an early forum with the editorial board in order to foster understanding of the issues, from his standpoint. Plaintiff's legislative superiors, however, were entitled to assurance that they would not be faced with sudden surprises, making them the last to know about the contents of audits. Plaintiff's insistence on getting a head start with the news media was rightfully treated as insubordinate, confrontational, and not entitled to First Amendment protection.

■ Plaintiff now contends that his conduct was legally sound as a matter of Missouri law, and that the Legislature was violating the law in trying to keep audit material confidential until formally presented. This need not be explored (as it was apparently not candidly discussed with the legislators before plaintiff violated the directive). Missouri law can sometimes be controlling in establishing liberty and property interests that must be honored as a matter of procedural due process. This First Amendment case, involving substantive due process, is not affected by a claimed violation of Missouri law. *Bagley v. Rogerson,* 5 F.3d 325 (8th Cir.1993); *Meis v. Gunter,* 906 F.2d 364, 369 (8th Cir.1990), *cert. denied,* 498 U.S. 1028, 111 S.Ct. 682, 112 L.Ed.2d 673 (1991). It is sufficient to conclude that the county employee's freedom of speech, as guaranteed by the First and Fourteenth Amendments, has not been violated.

■ In the alternative, it is doubtful and probably unlikely that the material which may have had a part in triggering the discharge was so inherently a matter of public concern that an employee who has "leaked" the information to the press, contrary to his

---

**2.** There is no showing that the Star published articles or editorials about the audit that could have been a factor in terminating plaintiff, and it seems undisputed that the termination was based on criticism of plaintiff's procedures. It was not content-based. *Compare, Roberts v. Van Buren Public Schools,* 773 F.2d 949, 956–7 (8th Cir. 1985); *Cox v. Dardanelle Public School Dist.,* 790 F.2d 668, 675 (8th Cir.1986).

**3.** Other problems need not be detailed.

**4.** A rule requiring clearance through a criticized superior would, of course, be unenforceable. *Atcherson v. Siebenmann,* 605 F.2d 1058, 1063 n. 5 (8th Cir.1979).

instructions, was entitled to constitutional protection. Plaintiff fails to meet his threshold obligation to satisfy the court that what he had to say was a matter of overriding public concern. Such a demonstration was his obligation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). From discovery material presented to the court, it can be gleaned that the most newsworthy issue dealt with in the audit of the Medical Examiner's Office was plaintiff's criticism that the medical examiner was on two payrolls, that of the county and Hospital Hill Health Services Corp. The dual employment had been previously considered by county officials, and legality had been endorsed by the County Counselor. Under the circumstances the audit information apparently qualifies as being routine in nature, not unlike the *Jurgensen* material. The Star's failure to publish anything on the subject tends to confirm this conclusion.

■ Characterizing the material, which is said to be a judicial obligation, has its difficulties. In some contexts such as defamation it would be ridiculous to say that an audit of a public agency is not a matter of public interest. But the judicial test here used is whether the material is so insistently a question of public concern that its release by any employee, in breach of any pledge of confidentiality or instruction that may have been given, must be treated as constitutionally immune from discipline. A demanding standard must be used, to avoid the extraordinary conclusion that almost nothing learned by an employee in the Supreme Court building or the White House or at City Hall can be properly subject to valid confidentiality restrictions.

Even if the reasonableness of the limited restraint imposed in this case were not established, therefore, plaintiff would fail to make a submissible case if, as here, he should fail to demonstrate that the particular material involved was entitled to unrestricted public

disclosure, as being inherently a matter of overriding public concern.

Judgment will be entered in favor of defendants.[5] SO ORDERED.

---

**5.** It may be noted that all individual defendants other than perhaps defendants Tindall, Coe and Waits would in any event be entitled to prevail on a qualified immunity defense. If their vote to terminate plaintiff was based in whole or in part on his violation of the restriction on premature release of audit information, and even if this could be ruled constitutionally invalid, no controlling precedent for such a novel ruling has been cited or found. At least four of the defendants were not violating a clearly established rule of constitutional law.