43 F.3d 1218
 10 IER Cases 323
 James A. BARNARD, Plaintiff-Appellant,
v.
JACKSON COUNTY, MISSOURI; Ed Growney, individually and in
his official capacity as Jackson County legislator; James
D. Tindall, individually and in his official capacity as
Jackson County legislator; Mary Lou Smith, individually and
in her official capacity as Jackson County legislator;
Robert Hertzog, individually and in his official capacity as
Jackson County legislator; Carol Coe, individually and in
her official capacity as Jackson County legislator; Fred
Arbanas, individually and in his official capacity as
Jackson County legislator; Dennis Waits, individually and
in his official capacity as Jackson County legislator,
Defendants-Appellees.
 No. 93-3758.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 9, 1994.
Decided Jan. 11, 1995.
Rehearing and Suggestion for Rehearing En Banc Denied Feb. 17, 1995.
 
 Steven L. Hobson, Kansas City, MO, argued (Ronald Stites, on the brief), for appellant.
 J. Earlene Farr, Kansas City, MO, argued, for appellee Jackson County; Thomas F. Gordon, Kansas City, MO, argued, for appellees Hertzog, Smith and Arbanas (F. Russell Millin, on the brief).
 Before LOKEN, Circuit Judge, BRIGHT, Senior Circuit Judge, and HANSEN, Circuit Judge.
 HANSEN, Circuit Judge.
 
 
 1
 James Barnard appeals from the district court's grant of summary judgment to Jackson County and seven individual legislators on his 42 U.S.C. Sec. 1983 cause of action, which alleged retaliatory discharge in violation of his First Amendment rights. Barnard argues that the district court misapplied the applicable law in determining that no genuine factual issue exists. We affirm in part and reverse in part.
 
 I. BACKGROUND
 
 2
 James Barnard worked as the legislative auditor for Jackson County, Missouri, from 1985 until his termination by the legislature in 1990. The legislative auditor is a charter officer who is appointed by the legislature and serves at its pleasure. Barnard's responsibilities as auditor included performing or overseeing audits of various county departments and offices, conducting investigations of county entities, and such other tasks as the legislature directed him to do.[1] The Jackson County Home Rule Charter provides that the auditor may be removed by a two-thirds vote of the nine-member legislature.
 
 
 3
 In early 1987, Barnard was informed of allegations that Carol Coe, a legislator, had engaged in certain illegal activities. Barnard brought this information to the attention of the Jackson County legislature through a written memorandum and an oral presentation at a public meeting. The matter was eventually investigated by the Jackson County Prosecuting Attorney's office. Upon completion of the investigation, the prosecutor's office made a determination that there was insufficient evidence to institute criminal proceedings against Coe.
 
 
 4
 Undaunted, Barnard contacted the local Federal Bureau of Investigation (FBI) office and provided them with information concerning the Coe matter. Barnard continued to meet with the FBI on about a monthly basis for the next three years regarding other local matters, including allegations regarding local judges, politicians, and county and city government employees. Some of these meetings took place during the hours of Barnard's employment. No prosecutions resulted from Barnard's contacts with the FBI. Barnard discontinued his meetings with the FBI on May 7, 1990. By that date, all of the county legislators were aware that Barnard had been meeting with the FBI.
 
 
 5
 A Jackson County ordinance requires the auditor to release reports and conclusions from audits directly to the legislature.[2] In several instances, however, upon completing internal audits of county agencies and offices, Barnard informally discussed the results with members of the local press prior to furnishing his report to the legislature. Several legislators became aware of this practice and expressed concern because they were being subjected to inquiries from the press and constituents concerning the audits before they had received and read them. Thus, on April 27, 1990, Barnard was instructed to defer discussions with third parties concerning audits and investigations until the legislators had been provided with a copy of the audit or investigation for personal review.[3] Once an audit was presented to the legislature, it became a matter of public record and any official, including Barnard, could discuss its results with third parties. Barnard admittedly agreed to comply with this directive.
 
 
 6
 In late 1989, allegations were made that an assistant county medical examiner was in violation of certain county conflict of interest rules. The legislature directed Barnard to conduct an audit of the county medical examiner's office. Barnard formally presented the results and conclusions of the audit to the Finance and Audit Committee of the legislature on June 29, 1990. However, Barnard had met with several members of the editorial board of the Kansas City Star prior to releasing the results of the audit to the legislature, despite the instructions he received on April 27 to refrain from such acts. His avowed purpose for this meeting was to garner the Star's support for the results and conclusions he had reached in the medical examiner's audit. In July of 1990, the legislature became aware that Barnard had leaked the results of the audit to the Star prior to providing such information to the legislature. On August 13, 1990, the legislature voted 7-0 to discharge Barnard as auditor.[4]
 
 
 7
 Barnard subsequently filed the present 42 U.S.C. Sec. 1983 action against Jackson County and the individual legislators who voted to terminate him, alleging that he was discharged in retaliation for exercising his First Amendment rights of free speech and association. Specifically, Barnard argued that his FBI contacts and discussions with the Kansas City Star concerning the medical examiner's audit were protected First Amendment activities, his interest in exercising these rights outweighs Jackson County's interest in suppressing such speech, and his discharge thus runs afoul of the First Amendment. The district court granted summary judgment in favor of the County and the individual legislators. Barnard v. Jackson County, Missouri, et al., 832 F.Supp. 1338 (W.D.Mo.1993). Barnard appeals.
 
 II. DISCUSSION
 
 8
 Summary judgment is appropriate when the record as a whole shows that "there is no genuine issue as to any material fact and [ ] the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). No genuine issue exists for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting First Nat. Bank of Arizona v. Cities Service Co., 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)). We review a district court's grant of summary judgment de novo. United States ex rel. Glass v. Medtronic, Inc., 957 F.2d 605, 607 (8th Cir.1992).
 
 
 9
 Barnard makes the following contentions about his discussion with the Star concerning the medical examiner's audit: (1) this private contact related to matters of public concern and is protected by the First Amendment; (2) the defendants did not establish that the County's interest in maintaining efficiency in the workplace outweighed his First Amendment interests; (3) this contact was a motivating factor in the decision to terminate his employment; and (4) his First Amendment right to speak and associate with the members of the Star was so well established that the defense of qualified immunity is unavailable to the defendants. Barnard makes the following contentions about his meetings with the FBI: (1) these private meetings concerned possible criminal acts, were matters of "public concern" and outweighed the county government's interest as his employer in preventing this speech; and (2) whether these contacts were a motivating factor in his termination is a disputed issue of material fact. As a result of the above issues, Barnard contends, the district court erroneously granted the defendants summary judgment.
 
 
 10
 A. Barnard's Contacts with the Kansas City Star
 
 
 11
 It is well recognized "that a State may not discharge an employee on a basis that infringes [upon] that employee's constitutionally protected interest in freedom of speech." Rankin v. McPherson, 483 U.S. 378, 383, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987) (citing Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972)). Courts evaluating claims by public employees who allege discharge in derogation of their First Amendment rights must engage in a two-step inquiry. First, courts must determine whether the employee's speech can be "fairly characterized as constituting speech on a matter of public concern." Connick v. Myers, 461 U.S. 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983); Shands v. City of Kennett, 993 F.2d 1337, 1342 (8th Cir.1993) (quoting Connick, 461 U.S. at 146, 103 S.Ct. at 1689), cert. denied, --- U.S. ----, 114 S.Ct. 880, 127 L.Ed.2d 75 (1994). If so, the second inquiry involves balancing the employee's right to free speech against the interests of the state. Rankin, 483 U.S. at 388, 107 S.Ct. at 2899; Casey v. City of Cabool, Mo., 12 F.3d 799, 802-03 (8th Cir.1993), cert. denied, --- U.S. ----, 115 S.Ct. 325, 130 L.Ed.2d 285 (1994). Courts must strike "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering v. Board of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). These two questions are matters of law for the court to resolve. Connick, 461 U.S. at 148 n. 7, 150 n. 10, 103 S.Ct. at 1690 n. 7, 1692 n. 10. Because we believe that the second component of the above test resolves the issues regarding Barnard's contacts with the Star, we assume without deciding that Barnard's speech with the Star touched upon matters of public concern, and we proceed to the Pickering balancing test.
 
 
 12
 The Pickering balancing test "requires full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public." Connick, 461 U.S. at 150, 103 S.Ct. at 1692. As an employer, a governmental body enjoys a legitimate interest in " 'promot[ing] efficiency and integrity in the discharge of official duties, and [in] maintain[ing] proper discipline in the public service.' " Id. at 150-51, 103 S.Ct. at 1692 (quoting Ex parte Curtis, 106 U.S. 371, 373, 1 S.Ct. 381, 383, 27 L.Ed. 232 (1882)) (alterations in original). The governmental body bears the burden of establishing permissible grounds for an employee's discharge. Id. at 150, 103 S.Ct. at 1691.
 
 
 13
 Pertinent considerations in the application of the Pickering test are whether the employee's speech has a detrimental impact on working relationships where personal loyalty or confidence is necessary, and whether the speech impedes the efficient operation of the governmental entity's function. Rankin, 483 U.S. at 388, 107 S.Ct. at 2899. Employee acts of insubordination may tip the balancing process in favor of the employer's interests in the efficient promotion of its services. Connick, 461 U.S. at 151-53, 103 S.Ct. at 1692-93. See also Hubbard v. E.P.A., 949 F.2d 453, 459-60 (D.C.Cir.1991); Jurgensen v. Fairfax County, VA., 745 F.2d 868, 883-84 (4th Cir.1984). The primary focus in applying the Pickering test is to determine whether the speech undermines "the effective functioning of the public employer's enterprise." Rankin, 483 U.S. at 388, 107 S.Ct. at 2899.
 
 
 14
 In the present case, several legislators indicated that Barnard's penchant for disclosure of information to the press prior to its disclosure to the legislature had an adverse impact on their ability to efficiently carry out legislative tasks. Legislators could be and in some instances were contacted by the press and constituents concerning audits and investigations, the results of which the legislators were unaware. This prevented the legislators from communicating knowledgeably with the press and their constituents concerning matters which had been "leaked" and had the potential to erode citizen confidence in a competent and informed legislature. Barnard's "leaks" forced the legislature to enact the "Communication Guidelines Pertaining to Legislative Auditor," which did not preclude Barnard from discussing audit results with the press but merely operated as a reasonable time restriction. As noted earlier, Jackson County Code Sec. 211.7 requires that once an auditor's report is released to the legislature it must ("shall") be placed on the agenda of the next meeting as new business. Once that occurred, Barnard was free to garner all the public support for his conclusions he could and in whatever way he could muster. The legislature did not require that it be the first to know of the reports--only that the legislators not be the last to be informed by Barnard of the results of his investigations.
 
 
 15
 More importantly, several legislators viewed Barnard's refusal to adhere to the "Communication Guidelines," after his agreement to do so, as an act of insubordination and misconduct which undermined legislator confidence in him. The nature of Barnard's duties as legislative auditor required him to work in close harmony with members of the legislature and demands someone the legislature views as possessing integrity, loyalty, and a willingness to adhere to legislative requests. He was appointed by the legislature, served at its pleasure, and undertook tasks as it directed him to perform. He frequently dealt with sensitive issues of county government which the legislature justifiably viewed as confidential until they were fully investigated and reported upon. His interest in gaining support from the editors of the Star for the conclusions of the not-yet-released medical examiner's audit in advance of informing his employer of the results is substantially outweighed by the Jackson County legislature's right to demand that its employees follow its procedures and its need to possess the information contained in the audits before being contacted by the press or constituents about them.
 
 
 16
 Further, Barnard's asserted First Amendment "right to leak" information that he has gathered as the legislature's investigator is dubious in the face of a dearth of case law reaching such a conclusion. The few reported cases that address this issue indicate that such a right is not tenable. See Hubbard, 949 F.2d at 459-60; Jurgensen, 745 F.2d at 883-84. As the able district judge observed, the absence of such case law indicates that public employees seldom argue that such a right exists. Barnard, 832 F.Supp. at 1341. For instance, few would dispute the President's authority to terminate a staff member who had a propensity to "leak" sensitive information to the press before the President was informed of it. In such instances, the integrity and proper functioning of the office mandate that information be made known to the office holder before it is disseminated to the public. The same holds true in this case for the office of the Jackson County legislative auditor.
 
 
 17
 The defendants have satisfied their burden to show that their interest in the efficient functioning of the legislature outweighs Barnard's personal interest in disseminating audit and investigation results to the press prior to providing it to his employer, the legislature. We hold that Barnard's termination as legislative auditor was not made in violation of his First Amendment rights as a public employee with respect to his contacts with the Kansas City Star.
 
 B. Barnard's Contacts with the FBI
 
 18
 Barnard alleges that his contacts with the FBI which spanned three years were protected First Amendment activity and played a substantial role in the legislature's decision to terminate him. In support of his argument, Barnard proffers several statements from legislators which he contends illustrate their disapproval with his meetings with the FBI and create a fact issue on causation, thereby precluding summary judgment. The district court held that Barnard's meetings with the FBI were "stale," i.e., too remote in time to have played a role in the legislature's decision to fire him. Barnard, 832 F.Supp. at 1340. Specifically, the district court ruled as a matter of law that "[i]nsufficient evidence of causation mandates a ruling for defendants on the FBI issue." Id. Before making its causation ruling and without citation to Connick or Rankin, the district court said that "[i]t seems rather well settled, however, that private communications in the nature of whistle-blowing are entitled to First Amendment protection from governmental discipline or retaliation, and that any such retaliation against plaintiff for going to the FBI would violate plaintiff's federally protected employment rights." Id.
 
 
 19
 Barnard's FBI contacts must be subjected to Connick 's two-part test to determine whether they are speech protected by the First Amendment. Again, this is a question of law for the court. Connick, 461 U.S. at 148 nn. 7 & 10, 103 S.Ct. at 1690 nn. 7 & 10. Speech disclosing allegations of criminal activity allegedly committed by elected public officials and allegations of official misconduct by an incumbent elected official are matters occupying "the highest rung of hierarchy of First Amendment values." O'Connor v. Steeves, 994 F.2d 905, 915 (1st Cir.) (quoting Connick, 461 U.S. at 145, 103 S.Ct. at 1689), cert. denied sub. nom., Town of Nahant, Mass. v. O'Connor, --- U.S. ----, 114 S.Ct. 634, 126 L.Ed.2d 593 (1993). Such speech is of inherent public concern. Id. See also O'Donnell v. Yanchulis, 875 F.2d 1059, 1061 (3rd Cir.1989) ("[a]llegations of corrupt practices by government officials are of the utmost public concern"); Gorman v. Robinson, 977 F.2d 350, 356 (7th Cir.1992) (communications over a three year period to the FBI by housing authority purchasing agent concerning crimes by public housing employees are matter of "great concern to the public"); Roth v. Veteran's Admin. of Gov't of U.S., 856 F.2d 1401, 1406 (9th Cir.1988); Brown v. Texas A & M Univ., 804 F.2d 327, 337-38 (5th Cir.1986). Accordingly, because Barnard's contacts with the FBI constitute speech on a matter of public concern, we proceed to discuss Connick's second requirement--the Pickering balancing test.
 
 
 20
 Information alleging abuse of public office by an elected public official "represents a public benefit entitled to great weight in the Pickering balance." O'Connor, 994 F.2d at 915. Considerations relevant to the legislators' interests are those we enumerated earlier which include but are not limited to "whether the statement impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Rankin, 483 U.S. at 388, 107 S.Ct. at 2899.
 
 
 21
 We also observe that Barnard's personal motives, if any there be, for divulging information to the FBI may be factored in the Pickering balancing test. See O'Connor, 994 F.2d at 915. "[I]nsofar as self-interest is found to have motivated public-employee speech, the employee's expression is entitled to less weight in the Pickering balance than speech on matters of public concern intended to serve the public interest." Id. In the present case, the district court determined that Barnard "has apparently served as a self-appointed informant to the Federal Bureau of Investigation." Barnard, 832 F.Supp. at 1339.
 
 
 22
 Because the district court decided this case on Plaintiff's failure to demonstrate causation because of "staleness," a decision we hereinafter conclude to have been erroneous, it never performed the Pickering balancing test with respect to the FBI contacts. We believe the district court is best equipped to do so in the first instance, and hence we will remand for that purpose. Upon remand, the district court is free in conducting the Pickering test to determine whether Barnard's motives for speaking with the FBI were less than altruistic and therefore accord this expression less weight than speech purely intended to serve the public's interest.[5]
 
 
 23
 If speech is determined to be protected under the Connick two-part test, then a plaintiff must show that the speech played a substantial role in his discharge "or, to put it in other words, that it was a motivating factor in the [discharge] decision." Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977) (quotations and footnote omitted). If the plaintiff makes that showing, then the burden shifts to the defendant to prove "that it would have reached the same decision ... even in the absence of the protected conduct." Id. at 287, 97 S.Ct. at 576. Ordinarily, the issue of whether protected speech played a substantial role in a public employee's termination is an issue of fact to be resolved by the jury. Shands, 993 F.2d at 1343; Cox v. Dardanelle Pub. Sch. Dist., 790 F.2d 668, 675 (8th Cir.1986). However, the discharged employee does not in every case successfully resist a summary judgment motion merely by asserting that certain protected speech caused termination from public employment. At some point, the speech becomes so remote in time to the discharge that a court may rule as a matter of law that even if such speech enjoys First Amendment protection, it played no role in the employee's termination. See O'Connor v. Chicago Transit Auth., 985 F.2d 1362, 1368 (7th Cir.1993) ("the mere fact that protected speech precedes an employment decision does not create the inference that the speech motivated the employment decision").
 
 
 24
 The plaintiff's evidence would tend to show that in late April 1990, after learning that Barnard was talking to the FBI, the Chairman of the Legislature, the Reverend Mr. Tindall, asked Barnard for his resignation. When Barnard asked why the request was made, Chairman Tindall refused to state a reason. At an executive session of the legislature held on May 7, 1990, called to discuss Barnard's performance, Mr. Tindall led off the meeting by informing the other legislators that Barnard had gone to the FBI, that Tindall did not trust Barnard, that Tindall had asked Barnard for his resignation and that Barnard had refused to give it, and that Tindall wanted Barnard fired. Barnard has one witness who attended the May 7 meeting who will testify that Tindall said Barnard should be fired because he went to the FBI. Other legislators asked Barnard to tell them what he had told the FBI about them. Some of them expressed anger that Barnard had gone to the FBI without telling them first. Legislator Waits asked Barnard sometime prior to the May 7 meeting if Barnard was "wired" and what Barnard had told the FBI about him. Legislator Coe (about whom Barnard had specifically gone to the FBI in the first instance) reportedly said, "That's why they [the FBI] have so much information on me."
 
 
 25
 There is some evidence that a deal was struck at the May 7, 1990, meeting which included Barnard's agreement that he would not talk to the FBI again without first notifying the legislature and that he would continue to be employed until the new legislature took office at the beginning of 1991 (after the 1990 elections) when a decision would be made about his continued employment.
 
 
 26
 Arrayed against this evidence is the evidence provided by the individual legislator defendants that their decisions to terminate Barnard, made some three months later on August 13, 1990, were not based upon his previous FBI contacts but upon a variety of other factors including his violation of the April 27, 1990, "Communication Guidelines" in going to the Star about the medical examiner's audit in late June of 1990, his general incompetence as an auditor, his taking of an allegedly unofficial vacation, and other assorted management and personal shortcomings.
 
 
 27
 We believe the district court erred when it held as a matter of law that the plaintiff failed to produce sufficient evidence of causation to raise a genuine issue of fact as to whether or not his contacts with the FBI, which continued up to May 7, 1990, were a motivating factor in his termination on August 13, 1990. It took six votes to terminate Barnard. Of the seven votes cast against him, three were cast by legislators who three months earlier were the most vocal critics of his informer's relationship with the FBI. According to one witness, all of the legislators who voted to terminate him would have heard Chairman Tindall declare that Barnard should be fired for going to the FBI. We do not believe that the three-month time span between the May 7 meeting and the August termination is long enough to make the FBI matter "stale" as a matter of law. The evidence of record, together with the reasonable inferences that can be drawn from it, creates a jury issue concerning whether or not Barnard's FBI contacts were a motivating factor in any legislator's termination decision.
 
 
 28
 The district court also ruled that because there was no evidence that the two-thirds of the legislators necessary to terminate were adversely motivated by reason of the plaintiff's FBI contacts, there was no factual basis for a trier of fact to conclude that such hostility may have caused the plaintiff's termination. If the plaintiff's evidence and its reasonable inferences are credited by the fact finder, it could find that three of the seven legislators who voted for termination were motivated by an unconstitutional reason, and without those three votes, Barnard would not have been fired. In fact, even if only two of those three votes were improperly motivated, the motion to fire Barnard would not have received the necessary six votes to pass.[6]
 
 III. CONCLUSION
 
 29
 For the reasons enumerated above, we affirm the district court's grant of summary judgment on the plaintiff's claim that he was terminated because of his contacts with the Kansas City Star, and we reverse and remand for further proceedings on his claim concerning his contacts with the FBI.
 
 
 
 [1]
 Article VIII of the Jackson County Constitutional Home Rule Charter delineates the responsibilities of the Legislative Auditor as follows:
 Section 4. A continuing internal audit system shall be provided by the legislature. The legislature shall appoint a county auditor for a term of four years. He may by removed by a vote of two-thirds of the legislature. The auditor shall have the powers and duties prescribed by law and by ordinance. The auditor shall render to the legislature and the executive annual reports and such other reports as he shall deem advisable, or shall be required by ordinance.
 Section 5. An audit by independent certified public accountants shall be performed at the end of each fiscal year, and the legislature shall provide annually for the scope of such audit, provided, however, a complete audit of every office and department shall be performed not less frequently than every three years.
 (Appellant's App. at 551-52.)
 
 
 [2]
 Specifically, Jackson County Code Sec. 211.7 provides:
 Release of Report The Auditor shall release his reports directly to the County Legislature, the County Executive and the Clerk of the County Legislature who shall place the report on the agenda of the next meeting of the County Legislature under new business.
 (Appellant's App. at 643.)
 
 
 [3]
 Barnard was given a document entitled "Communication Guidelines Pertaining to Legislative Auditor." The document was signed by the three members of the Finance and Audit Committee of the legislature, who had direct oversight of Barnard's position. The document provides:
 Any audit performed by the Auditor's office shall be considered confidential in nature and will be treated in such a manner.
 All findings from audits shall be reported to the Finance and Audit committee in written form with [a] copy to the Legislative Chairman. The committee may desire to question the auditor or employees of that office regarding an audit report, in which case the question may be verbally answered.
 No employees of the Legislative Auditor's staff shall contact any person outside that office in regard to any investigation performed by that office other than those persons involved in the investigation.
 In the event that a contact inquiry is made with any employee of the Auditor's office, employees shall refrain from answering and the inquiries should be referred to the members of the Finance committee. The committee members should be notified immediately with the substance of the contact detailed on a Legislative Auditor Contact Record (see copy attached).
 (Appellant's App. at 548.)
 
 
 [4]
 The legislators who were not present when the legislature voted on August 13, 1990, to terminate Barnard are not parties to the present action
 
 
 [5]
 Given the above statement of the law, it may be argued that going to the FBI with evidence of alleged wrongdoing that has already been aired publicly and thoroughly investigated but not prosecuted by one sovereign, and thereafter agreeing to work as a self-appointed "mole" for the FBI for three years' time should be construed as an act of unacceptable disloyalty by a trusted employee rather than the valid exercise of a First Amendment right and consequently entitled to little weight under the Pickering balancing formula. However, we leave to the district court to determine whether Barnard's contacts with the FBI were motivated by self-interest, such as vengeance against Legislator Coe and others, or whether Barnard sought to further the public interest by providing his information to the FBI, along with the appropriate weight his speech is to receive under Pickering
 
 
 [6]
 We decline to address the defendants' qualified immunity argument because that was not a basis for the district court's ruling on the motions for summary judgment. We construe footnote 5 in the district judge's opinion as a gratuitous comment about the potential for a qualified immunity claim. Given our existing case law, see Grantham v. Trickey, 21 F.3d 289 (8th Cir.1994); Bartlett v. Fisher, 972 F.2d 911 (8th Cir.1992), we agree with the district court that several of the defendants may be entitled to assert a qualified immunity defense. We leave to the district court to determine the merits of any such claims, if and when made, on remand