# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-1511

_____

R. SCOTT SEXTON; CYNTHIA W.     \*
SEXTON;  KRIS KISTLER;     \*
PATRICIA KISTLER; GARY     \*
DUDLEY; JOSEPH FIORINO;     \*
RICHARD POMEROY; JOHN     \*
REIFSCHNEIDER; MYRNA     \*
DUDLEY; CAROLYN FIORINO;     \*
JANICE POMEROY;     \* Appeal from the United States
LEE REIFSCHNEIDER;     \* District Court for the Eastern
     \* District of Missouri
     Plaintiffs/Appellees     \*
     \*      [PUBLISHED]
     v.     \*
     \*
RONALD MARTIN,     \*
     \*
     Defendant/Appellant     \*
     \*
CITY OF DES PERES, MISSOURI     \*
     \*
     Defendant.     \*

_____

Submitted: December 14, 1999
Filed:  April 19, 2000

_____

Before RICHARD S. ARNOLD and HANSEN, Circuit Judges, and MELLOY,[1] District Judge.

_____

MELLOY, District Judge

Ronald Martin ("Martin"), former Director of Public Safety for the City of Des Peres Department of Public Safety ("DPS"), appeals the district court's[2] denial of his request for qualified immunity in this civil rights action filed by R. Scott Sexton ("Sexton") and Kris Kistler ("Kistler"). We affirm the district court's ruling.

## I. BACKGROUND

Sexton and Kistler are former Public Safety Officers for the DPS. The DPS provides police, fire, and ambulance services to the residents of the City of Des Peres, Missouri. Martin served as the Director of Public Safety for the DPS during the entire period of Sexton's and Kistler's employment. Immediately below Martin in the department hierarchy were William Bridges and Keith Krumm, both of whom held the rank of Captain.

The DPS was originally located at 1019 North Ballas Road in the City of Des Peres ("the old building"). In approximately 1974, the DPS began recording telephone conversations that took place in the DPS building. Martin asserts conversations were recorded for purposes of security, safety, and quality control. The recording device was located in the dispatch area of the building and recorded telephone and radio conversations twenty-four hours a day. The recording was done by instrument rather

_____

[1]The Honorable Michael J. Melloy, United States District Court for the Northern District of Iowa, sitting by designation.

[2]The Honorable Lawrence O. Davis, United States Magistrate Judge for the Eastern District of Missouri, hearing the case by the consent of the parties.

than by line; that is, every conversation that took place on a particular telephone was recorded, regardless of which line was being used on that telephone. All the telephones in the building were recorded except for the telephone in the kitchen. The kitchen telephone was reserved for Public Safety Officers to make private calls to their families or to make other personal calls while on duty.

In July of 1992, the DPS moved into a new building. Like the old building, the new building utilized a recording device which recorded incoming and outgoing telephone calls. Unlike the old building, however, the recording in the new building was done by line rather than by telephone, and every line was recorded, including the private line in the kitchen. Sexton and Kistler maintain that the Public Safety Officers were not notified that their conversations were being recorded.

On April 8, 1995, Kistler drove his police vehicle through a supermarket window. An investigation was conducted and on October 17, 1995, Kistler was charged with several city regulatory violations.

On October 22, 1995, Sexton and Kistler investigated the telephone recording system and discovered that the telephone in the kitchen was being recorded. On October 24, 1995, Sexton, Kistler, and their attorney went to city hall to disclose to the public the private line in the DPS building was being recorded illegally and request that it be taken off the recording system.[3] On October 26, 1995, the recording of the private line ceased.

---

[3]The Missouri Wiretap Act, Rev. Mo. Stat. §§ 542.400 et seq., prohibits illegal wiretapping, which includes in its definition a person who "[k]nowingly intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire communication."

Kistler was terminated October 30, 1995, and Sexton was terminated December 11, 1995. Martin asserts that he recommended Sexton's termination because Sexton failed to account for his activities on October 22, 1995, and he failed to follow direct orders of superiors on that same date. Martin contends that he recommended Kistler's termination for gross negligence in the operation of a motor vehicle on April 8, 1995, the failure to obey and promptly execute orders of superiors, and sleeping on duty. Their terminations were affirmed after hearings by the City of Des Peres Board of Aldermen. Sexton and Kistler subsequently brought a six-count complaint[4] which asserted that the City of Des Peres and Martin, among others, placed an illegal wiretap and illegally recorded private telephone conversations on a telephone designated for personal calls.

This appeal concerns Count II of the plaintiffs' Third Amended Complaint. In Count II, Sexton and Kistler filed a claim pursuant to 42 U.S.C. § 1983, asserting that Martin improperly recommended the plaintiffs' termination in retaliation for the exercise of their First Amendment free speech rights – namely, making public the City's potentially illegal wiretap.[5] In a motion for summary judgment, Martin sought protection from liability under the doctrine of qualified immunity. After the district court denied Martin's claim of qualified immunity as to plaintiffs' retaliatory discharge claims, Martin renewed his claim of qualified immunity in a supplemental motion for summary judgment. The district court again rejected his request, and Martin appeals the district court's ruling.

## II. DISCUSSION

---

[4]Count III, which purported to allege a cause of action under 42 U.S.C. § 1985, was dismissed for failure to state a claim.

[5]Count II also alleges retaliatory discharge based on plaintiffs' union activities. However, neither party briefed this issue on appeal. Thus, this Court will only address the claim as it relates to plaintiffs' speech concerning the wiretap.

"A district court's denial of a motion for summary judgment based on qualified immunity is immediately appealable." Collins v. Bellinghausen, 153 F.3d 591, 595 (8th Cir. 1998). We review the district court's denial of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party. Id.

Under the doctrine of qualified immunity, state actors are protected from civil liability when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (internal quotations omitted); McCaslin v. Wilkins, 183 F.3d 775, 778 (8th Cir. 1999). The qualified immunity inquiry is a two-step process. First, this Court must ascertain whether the plaintiffs have asserted a violation of a constitutional or statutory right. See Munz v. Michael, 28 F.3d 795, 799 (8th Cir. 1994) (citing Beck v. Schwartz, 992 F.2d 870, 871 (8th Cir. 1993) (per curiam)). Second, we must determine whether that constitutional right was clearly established at the time that the plaintiffs were discharged. See Munz, 28 F.3d at 799. "This court has . . . taken a broad view of what constitutes 'clearly established law' for the purposes of a qualified immunity inquiry. . . " Boswell v. Sherburne County, 849 F.2d 1117, 1121 (8th Cir. 1988), cert. denied, 488 U.S. 1010 (1989). "For a right to be deemed clearly established, the 'contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Buckley v. Rogerson, 133 F.3d 1125, 1128 (8th Cir. 1998) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). However, "[i]t is only necessary that the unlawfulness of the official's act [be] apparent in view of pre-existing law." Hall v. Lombardi, 996 F.2d 954, 958 (1993), cert. denied, 510 U.S. 1047 (1994). Therefore, if the law claimed to have been violated was clearly established, the qualified immunity defense ordinarily fails, "since a reasonably competent public official should know the law governing his conduct." Harlow, 457 U.S. at 818-19.

A.

Plaintiffs have properly alleged a violation of a constitutional right -- Martin recommended their discharge in retaliation for exercising their right to free speech. See, e.g., Rankin v. McPherson, 483 U.S. 378, 383 (1987) ("[i]t is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech."). The dispute in this case centers around the Court's second inquiry – whether the plaintiffs' free speech rights were clearly established at the time of discharge. To determine whether this right was clearly established, the Court must first determine whether the speech is protected by the First Amendment. This determination is also a two-step inquiry. See Kincade v. Blue Springs, Mo., 64 F.3d 389, 395 (8th Cir. 1995), cert. denied, 517 U.S. 1166 (1996). The threshold question this Court must answer is whether the speech can be fairly characterized as constituting "speech on a matter of public concern." Id. (quoting Connick v. Myers, 461 U.S. 138, 147-148 (1983)). If this Court finds the speech to be a matter of public concern, we turn to the second step, the Pickering balancing test, which "involves balancing the employee's right to free speech against the interests of the public employer." Id. (citing Pickering v. Board of Educ., 391 U.S. 563, 568 (1968)). Pickering requires we strike a "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [public employer] in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568.

(1)     Threshold Inquiry – "Matters of Public Concern"

As to the first step of the inquiry – whether it was clearly established that Sexton's and Kistler's speech was a matter of public concern at the time they were terminated – this Court has held that speech concerning potential misconduct by public officers is a matter of public concern. See Barnard v. Jackson County, Mo., 43 F.3d 1218, 1225 (8th Cir.), cert. denied, 516 U.S. 808 (1995); Brockell v. Norton, 732 F.2d 664, 668 (8th Cir. 1984). In Barnard, this Court found "[s]peech disclosing allegations of criminal activity allegedly committed by elected public officials and allegations of official misconduct by an incumbent elected official are matters occupying the highest

rung of hierarchy of First Amendment values . . . Such speech is of inherent public concern." 43 F.3d at 1225 (internal quotations omitted). Likewise, in Brockell this Court found allegations that a police officer improperly possessed a copy of the certification test, prior to his taking the test, were a matter of public concern. See 732 F.2d at 668. The Brockell Court reasoned that the "public has a vital interest in the integrity of those commissioned to enforce the law."[6] Id.

Other courts have also held that allegations of potential criminal conduct are a matter of public concern. See, e.g., Voigt v. Savell, 70 F.3d 1552, 1562 (9th Cir. 1995), cert. denied, 517 U.S. 1209 (1996) (noting "statements regarding criminal misuse of public funds, wastefulness, and inefficiency in managing and operating government entities [are] matters of public concern."); Walter v. Morton, 33 F.3d 1240, 1243 (10th Cir. 1994) (finding "statements of perceived illegal activities [by the Chief of Police] are a matter of concern for the community"); Gillum v. Kerrville, 3 F.3d 117, 120-21 (5th Cir. 1993), cert. denied, 510 U.S. 1072 (1994) (noting "[t]o be sure, corruption in [a police] internal affairs department is a matter of public concern"); Brawner v. Richardson, Tex., 855 F.2d 187, 190 (5th Cir. 1988) (holding that "[t]he disclosure of misbehavior by public officials is a matter of public interest and therefore deserves constitutional protection, especially when it concerns the operation of a police department"); Solomon v. Royal Oak Township, 842 F.2d 862, 865 (6th Cir. 1988)

---

[6]Martin attempts to distinguish Brockell by noting that the police officer was terminated after he revealed wrongdoing to a captain, rather than a direct supervisor, which was in fact a violation of the chain of command. See Brockell, 732 F.2d at 665. Martin correctly notes that while the court found discharging an officer for a violation of a chain of command policy is a violation of the First Amendment, the court went on to conclude that the mayor and the city council members asserted a good faith belief in the reasonableness of their conduct which entitled them to qualified immunity. Id. at 668-69. However, after the Brockell ruling, such a belief would no longer be reasonable because the law is now established that a termination on those grounds would be in violation of the First Amendment.

(holding that "speech disclosing public corruption is a matter of public interest and therefore deserves constitutional protection"); McMurphy v. Flushing, 802 F.2d 191, 196 (6th Cir. 1986) (stating "[o]bviously, the public is concerned with how a police department is operated, and efforts to give public exposure to alleged misconduct are protected.").

Martin contends that there is no case law specifically holding that speech announcing a city official's potentially illegal recording of private telephone conversations is a matter of public concern. Therefore, he maintains, a reasonable official in his position would not have known he was violating the plaintiffs' constitutional rights by terminating them for such conduct. Martin's strict reading of the "clearly established law" requirement is unsupported by the case law. Indeed, in Buckley, this Court explained that "[i]n order to determine whether a right is clearly established, it is not necessary that the Supreme Court has directly addressed the issue, nor does the precise action or omission in question need to have been held unlawful. In the absence of binding precedent, a court should look to all available decisional law, including decisions of state courts, other circuits and district courts." 133 F.3d at 1128 (citing Norfleet v. Arkansas Dep't of Human Services, 989 F.2d 289, 291 (8th Cir. 1993)). In examining our own case law, as well as that of other circuits, we conclude that at the time the plaintiffs were terminated, the law was clearly established that the disclosure of potential illegal conduct of public officials was a matter of public concern.

(2)     The Pickering Balance Test

Having ascertained it was clearly established that plaintiffs' speech was a matter of public concern at the time of their discharge, we turn to the second step of the judicial inquiry – the Pickering balancing test. As stated earlier, under this test we must balance the interest of Sexton and Kistler, as citizens, "in commenting upon matters of public concern [against] the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Shands v. Kennett,

993 F.2d 1337, 1342 (8ᵗʰ Cir. 1992), cert. denied, 510 U.S. 1072 (1994) (quoting Pickering, 391 U.S. at 568). "Factors relevant in conducting this test are whether the speech creates disharmony in the workplace, impedes the speaker's ability to perform his duties or impairs working relationships with other employees." Kincade, 64 F.3d at 397.

Before the Court commences the Pickering balancing test, however, it is critical to determine whether the defendant has produced sufficient evidence that the speech had an adverse effect on the efficiency of the employer's operations. See Burnham, 119 F. 3d at 678. In other words, to put the Pickering balancing test at issue, the public employer must proffer sufficient evidence that the speech had an adverse impact on the department. See id. The more the employee's speech reflects matters of public concern, the greater the employer's showing must be that the speech was disruptive before the speech can be punished. See id. at 679.

To this end, in his supplementary motion for summary judgment, Martin offered his own affidavit and the deposition testimony of the City Administrator, Douglas Harms, to demonstrate that the speech adversely affected Martin and the department. Specifically, Martin states in his affidavit that "[s]uch reporting adversely affected department morale because the supervisors were angry -- and expressed their anger directly to me – that Sexton and Kistler had taken their criticism of the recording of the kitchen line outside the Department's normal chain of command. Further, by accusing the Department of violating their constitutional rights, and directing that accusation to the press, such conduct damaged the Department's reputation and created significant political problems."

Martin is correct that when a public employee's exercise of free speech right affects the morale of the work force and damages the program's reputation, it may affect the efficiency of the operation of the public service. See Grantham v. Trickey, 21 F.3d 289, 295 (8ᵗʰ Cir. 1994). However, "a simple assertion by the employer that

contested speech affected morale, without supporting evidence," is not enough to support a grant of qualified immunity. Id. at 295 n.4. Mere allegations of disruption are insufficient to put the Pickering balance at issue. See Kincade, 64 F.3d at 398. Thus, while DPS supervisors' anger may have impaired working relationships between the supervisors and Martin, Martin does not say that in his deposition. Indeed, Martin has not provided any evidence in support of these conclusory statements. See Kincade, 64 F.3d at 398-99 (finding mere assertion that contested speech "adversely affected the efficiency of City's operations and substantially disrupted the work environment" with no supporting evidence is insufficient to place Pickering balance at issue). In further support of his claim of workplace disruption, Martin asserts that "[t]heir report threatened my authority with the Board of Alderman to run the office of the Department of Public Safety and I eventually resigned." Yet Harms' deposition testimony notes that Martin was not in good political standing with the Board even before this incident, and his termination or requested resignation was inevitable.[7]

Likewise, Harms' testimony does not bolster Martin's contention that the department's efficiency was jeopardized by the actions of Sexton and Kistler. Harms' testimony states only that "some citizens" appeared before the Board to express outrage, concern, or support. Yet, Harms could not discern "how many folks were there or how many fell on which side of the issue." Harms said those who spoke were

---

[7]Harms' deposition testimony states that in 1993 "the Board of Aldermen had expressed to [Martin] in his performance evaluation and pay raises some dissatisfaction with the level of his performance of the department for which they held him responsible and some dissatisfaction of the level of communication between him and elected officials about the performance of the department." Harms was asked to suggest to Martin that he explore the option of resigning because of the Board's dissatisfaction. Thus, according to Harms, the Board of Aldermen was already dissatisfied with Martin's performance well before the protected speech occurred. Martin apparently caused his own political problems with the Board and the allegations of misconduct by Sexton and Kistler were merely the last straw.

either "in support of the other officers or upset that the City was in the news." Harms did not testify that Sexton's and Kistler's speech damaged the reputation of the department or affected the department's efficiency.

We find that the statements by Martin and Harms are insufficient to put the Pickering balance at issue. Martin's vague and conclusory statements do not demonstrate with any specificity that the speech created disharmony in the workplace, impeded the plaintiffs' ability to perform their duties, or impaired working relationships with other employees. See Kincade, 64 F.3d at 397-98. A "government employer must make a substantial showing that the speech is, in fact, disruptive before the speech may be punished" and Martin has simply failed to make this showing. Burnham, 119 F. 3d at 680. For these reasons, Martin's failure to establish workplace disruption is fatal to his claim of qualified immunity. See id.

Even were this Court to apply the Pickering balancing test, Martin's defense of qualified immunity would still fail. As previously stated, the Pickering balance test requires this Court to strike a balance between the plaintiffs' interest in their speech conveying a matter of public concern and the employer's interest in promoting efficiency in the workplace. The issue becomes does Martin's "interest in suppressing the speech, to purportedly control workplace disruption, outweigh[] plaintiffs' First Amendment rights . . ." Burnham, 119 F.3d at 679. "[W]hen balancing an employee's interest against an employer's interest, the constitutional standard takes proportionality into account. '[T]he closer the employee's speech reflects on matters of public concern, the greater must be the employer's showing that the speech is likely to be disruptive before it can be punished.'" Id. (quoting Jeffries v. Harleston, 52 F.3d 9, 13 (2d Cir.), cert. denied, 516 U.S. 862 (1995)).

Bearing in mind the issue of proportionality, we examine the juxtaposition of Martin's meager showing of workplace disruption and plaintiffs' interest in revealing potentially illegal conduct of public employers. As explained supra, speech alleging

-11-

potentially illegal misconduct of public officials occupies the "highest rung of First Amendment hierarchy." Barnard, 43 F.3d at 1225. Martin counters plaintiffs' interest with mere allegations of disruption, such as their "conduct damaged the Department's reputation and created significant political problems." Yet Martin proffers no evidence to support this claim. For this reason, we find the balance weighs heavily in favor of the plaintiffs' protected speech.

Although no case law applying the Pickering balancing test to allegations of illegal conduct of police officers existed in the Eight Circuit at the time the plaintiffs were discharged, we may look to other jurisdictions in order to determine whether this law was clearly established at that time. See Buckley, 133 F.3d at 1129. Our finding that the plaintiffs' speech in this case outweighs the public employer's interest in containing workplace disruption is consistent with the case law in many jurisdictions at the time of the plaintiffs' terminations. See, e.g., Williams v. Kentucky, 24 F.3d 1526, 1537 (6th Cir.), cert. denied, 513 U.S. 947 (1994) (finding where allegations of illegal conduct of public employers have only minimal effect on the efficiency of the office the balance weighs in favor of the speech); Oladeinde v. Birmingham, 963 F.2d 1481, 1487 (11th Cir. 1992), cert. denied, 507 U.S. 987 (1993) (finding defendants' assertions of disruption were not outweighed by plaintiffs' police officers' speech); Bieluch v. Sullivan, 999 F.2d 666, 672-73 (2d Cir. 1993), cert. denied, 510 U.S. 1094 (1994) (finding allegations that speech concerning town budgets, school construction and tax expenditures "'posed a potential threat' to police operations" was insufficient to outweigh protected speech); Biggs v. Dupo, 892 F.2d 1298, 1303-04 (7th Cir. 1990) (finding police officer's interest in critiquing role of politicians in police department policies outweighed allegations of workplace disruption); Frazier v. King, 873 F.2d 820, 827 (5th Cir.), cert. denied, 493 U.S. 977 (1989) (finding generalized allegations of disruption at state correctional infirmary does not outweigh plaintiff's interest in exposing unethical medical practices affecting hundreds of inmates); Wulf v. Wichita, 883 F.2d 842, 867 (10th Cir. 1989) (finding purely speculative allegations of disruption do not outweigh police officer's protected speech); Rode v. G. Dellarciprete, 845 F.2d

1195, 1202 (3d Cir. 1988) (finding employee of police department's allegations of racial animus within department did not affect state's interest in efficiency and performance of department).

Martin correctly asserts that "when Pickering's fact-intensive balancing test is at issue, the asserted First Amendment right can rarely be considered clearly established for purposes of the Harlow qualified immunity standard." Grantham, 21 F.3d at 293 (internal quotations omitted). We agree that in many free speech cases the outcome of the Pickering balancing test would be unclear to a reasonable official. In the instant case, however, where the employees have spoken out on a matter of great public concern, and the evidence that the speech caused disruption in the workplace is minimal at best, the imprecision of the Pickering balance makes little difference in our determination. We conclude that at the time of the plaintiffs' termination, the law was clearly established that the balance would have weighed heavily in favor of the plaintiffs' exercise of free speech.

## B.

Alternatively, Martin argues that he relied on independent, legal reasons for terminating the plaintiffs' employment, and he would have reached the same the decision irrespective of their protected speech activity. Citing Mt. Healthy v. Doyle, 429 U.S. 274 (1977), Martin maintains that where there are undisputed facts that a public official would have carried out the same decision to terminate absent any illegal motive, he is entitled to qualified immunity as a matter of law.[8]

---

[8]Plaintiff Sexton contends Martin failed to raise this claim in the context of qualified immunity in the district court, and is thus barred from raising it now. We disagree. In Martin's supplementary motion for summary judgment, Martin argues in the qualified immunity portion of this brief that he "is entitled to qualified immunity because it was not clearly established that he could be guilty of unconstitutional retaliation when he would have recommended plaintiffs' terminations even had they

As an initial matter, we note that to the extent Martin is merely requesting this Court to determine whether the facts support his assertion that he discharged the plaintiffs based on legal reasons, his request is denied. Our jurisdiction in the appeal of qualified immunity is limited to "abstract issues of law and does not extend to arguments concerning the sufficiency of evidence." Mueller v. Tinkham, 162 F.3d 999, 1002 (8ᵗʰ Cir. 1998). That is to say, "if what is at issue in the sufficiency determination is nothing more than whether the evidence could support a finding that particular conduct occurred," that claim is not immediately reviewable by this Court. See Behrens v. Pelletier, 516 U.S. 299, 313 (1996). If, however, a public official is claiming "on appeal that their actions were objectively reasonable in light of their knowledge at the time of the incident" their claim of qualified immunity is reviewable. See Lyles v. Barling, 181 F.3d 914, 917 (8ᵗʰ Cir. 1999) (quoting Mueller, 162 F.3d at 1002).

In Martin's appellate brief, his argument reads like a sufficiency of the evidence question. He spends the majority of his analysis arguing that the facts giving rise to his legal, independent grounds are undisputed by the plaintiffs, and they constitute independent, sufficient grounds for the plaintiffs' termination. However, at the close of his argument Martin does state "there is no clearly established law that a reasonable official in Chief Martin's position would have known he was violating plaintiff[s'] First Amendment rights by recommending termination." (emphasis in the original). Martin is entitled to qualified immunity if his actions were "objectively reasonable in light of the clearly established law and facts known by the officer at the time of his actions." McCaslin, 183 F.3d at 778 (quoting Lyles, 181 F.3d at 917); Anderson, 483 U.S. at 639 (finding question of whether qualified immunity is warranted generally turns on objective reasonableness of public employer's action). Because Martin concludes his

---

engaged in no protected conduct or speech." While Martin did not rely on Mt. Healthy v. Doyle in making this argument at the district court level, he sufficiently raised the issue such that it was preserved for appeal.

argument in these terms, we find this Court does have jurisdiction to address his defense. See McCaslin, 183 F.3d at 778 (finding review appropriate where defendant officer alleged his decision to use deadly force was objectively reasonable in light of his knowledge at the time); Collins, 153 F.3d at 595 (finding review appropriate where defendant, a state-employed psychiatrist, alleged her decision to use particular procedure was objectively reasonable).

Martin asserts he recommended the plaintiffs' termination on the basis of legitimate, unrelated conduct. Specifically, Martin alleges his decision to terminate Sexton was premised on Martin's claim that Sexton failed to account for his activities of October 22, 1995 and failed to follow direct orders of superiors on that same date. As for Kistler, Martin contends that he recommended his termination for gross negligence in the operation of a motor vehicle, the failure to obey and promptly execute orders of superiors, and sleeping on duty. Martin argues these proffered reasons went undisputed by the plaintiffs, and he would have recommended the plaintiffs' termination regardless of their protected speech.[9]

However, there is sufficient evidence for a reasonable juror to conclude that Sexton and Kistler were discharged for their disclosure of the wiretap on the private line and not for the reasons stated by Martin. For example, the record shows that

---

[9]In making this argument, Martin relies heavily on the district court's finding that the "defendant City had shown by uncontroverted evidence that plaintiffs Sexton and Kistler would have been fired, regardless of whether they engaged in their protected activity." Sexton v. Martin, No. 4:95 Civ. 2026 (E.D. Mo. Jan. 21, 1999). Martin's reliance on this finding by the district court is without merit. The district court's finding was based on the notion that the City was unaware of any improper retaliation by Martin at the time the Board of Alderman approved the decision to discharge the plaintiffs. The same can not be said for Martin. Indeed, the district court went on to find that there is ample evidence that Martin was keenly aware of Sexton's and Kistler's public criticism of the DPS' conduct prior to his decision to recommend their discharge.

Martin was aware of the plaintiffs' exercise of First Amendment protected speech and that this speech caused Martin some problems personally. Additionally, the timing of the terminations is suspiciously close to the protected speech activity in October of 1995. Kistler was discharged six days after the disclosure of the wiretap, purportedly for an accident that occurred some six months prior. Three days after the disclosure of the wiretap, Martin instigated an investigation into Sexton's actions. Sexton was discharged six weeks later for charges including minor violations such as using his patrol car to call his attorney in violation of a policy which states department equipment is not to be used for personal use, and failing to notify his supervisor of his whereabouts when he went to his patrol car to call his attorney. Moreover, these two terminations took place in a department where terminations, by Captain Bridges' own account, "were not very routine." There are questions of material fact concerning whether Martin recommended the plaintiffs' terminations on the basis of their speech alone or on the basis of some legitimate reason. A question of material fact precludes a grant of qualified immunity.

## III. CONCLUSION

In sum, we agree with the district court's conclusion that Martin is not entitled to summary judgment based on qualified immunity on plaintiffs' First Amendment retaliatory discharge claims.

For the reasons stated herein, the district court's ruling is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.