EDUCATION MINNESOTA LAKE-VILLE, Lakeville Education Assistants Federation, Marsha McDowall and Sheri Brown, Plaintiffs,

v.

INDEPENDENT SCHOOL DISTRICT NO. 194 and Lakeville Public Schools, Defendants.

No. 04–4488 (RHK/JSM).

United States District Court, D. Minnesota.

Oct. 20, 2004.

Harley M. Ogata, Education Minnesota, St. Paul, Minnesota, for Plaintiffs.

Susan E. Torgerson, Rider Bennett, LLP, Minneapolis, Minnesota, for Defendant.

## MEMORANDUM OPINION AND ORDER

KYLE, District Judge.

### Introduction

During this election season, the unions representing teachers and educational assistants in the Lakeville, Minnesota, school district desired to distribute pro-John Kerry brochures in teacher mailboxes within Lakeville schools. The school district, based upon school policy, prohibited the union from disseminating the brochures. The unions sued the school district on the grounds that its rights under the First Amendment and under certain labor laws have been violated. Before the Court is the plaintiffs' Motion for a Temporary Restraining Order [1] in which the unions request that the school district be prevented from enforcing the school policy that is restricting their access to teacher mailboxes. For the reasons set forth below, the Court will deny the Motion.

### Background

Plaintiffs Education Minnesota Lakeville ("EML") and Lakeville Education Assistants Federation ("LEAF") are the exclusive representatives of teachers and educational assistants in the Lakeville, Minnesota, public school district. (Coughlin Aff. ¶¶ 7, 8.) Plaintiff Sheri Brown is the EML President and Plaintiff Marsha McDowall is the LEAF Lead Grassroots Advocate. Both are responsible for disseminating political communications and literature to the EML and LEAF membership. (*See* McDowall Aff. ¶ 2.) Defendants are the Independent School District No. 194 and the Lakeville Public Schools (collectively, the "School District").

In 1997, the School District's school board adopted policy D–160, which restricts access to employee mailboxes and the internal mail systems (the "Mailbox Policy"). (Coughlin Aff. ¶ 4, Ex. A.) The Mailbox Policy provides, in relevant part:

#### ACCESS TO EMPLOYEE MAILBOXES AND SCHOOL DISTRICT INTERNAL MAIL SYSTEMS

##### I. PURPOSE

The purpose of this policy is to provide for access to employee mailboxes and the school district's internal mail systems, taking into consideration the educational objectives and responsibilities of the school district.

##### II. GENERAL STATEMENT OF POLICY

A. Employee mailboxes and the school district's internal mail systems are reserved for **school district related business** and the facilitation of internal communication of school related matters to school district employees, except as provided in Section II, B of this Policy.

B. Employee mailboxes may be opened to nonschool persons or organizations that engage in activities of interest and educational relevance to students. Such access by nonschool persons or organizations is governed by [another policy]. However, all decisions regarding access to employee mailboxes by nonschool persons or organizations will be reviewed and determined by the superintendent. The superintendent is responsible for ensuring that a right of access be extended equally to other entities of a similar nature when employee mailboxes are opened pursuant to this provision (i.e. Girl Scouts, Boy Scouts, Campfire Girls, Cub Scouts etc.).

---

1. Although plaintiffs' motion is styled as a motion for a temporary restraining order, both parties received notice of the motion and were heard by the Court on October 20, 2004.

Therefore, the Court will construe the motion as one for a preliminary injunction. Fed. R.Civ.P. 65(a).

**C. Employee mailboxes and the school district internal mail systems shall be open to the exclusive representatives of school district employees on matters within the scope of the official representational duties of the unions.**

**D. No literature endorsing any political candidate or other similar political materials shall be distributed in employee mailboxes or in the school district's internal mail systems.**

E. The distribution of political materials or other non-school sponsored materials on school district property through alternative channels, i.e. not through employee mailboxes or the internal mail systems, is governed by the applicable provisions of [other policies].

(*Id.* Ex. A (emphasis added).)

The Mailbox Policy also defines several terms:

D. "Political candidate" is a person who seeks nomination or election to a partisan or nonpartisan public or party office or who has filed as a candidate for election.

E. "Political issue" is an issue that is the subject of a public referendum or which is being debated by political candidates or organizations.

F. "Political materials" include, but are not limited to, any paper, handbill, poster, booklet, brochure, advertisement, sample ballot, display, or audio or video presentation, that pertains to a political candidate or political issue.

G. "Mailboxes" and "Internal mail systems" means employee mailboxes and school district internal mail systems includ[ing] paper mail, voice mail, computer electronic mail (e-mail) and any other potential technologies used for mail purposes.

(*Id.*) An employee who violates the Mailbox Policy may be subject to discipline. (*See id.*)

According to the School District's Director of Administrative Services, Tom Coughlin, it was "necessary for the School District to develop and implement [the Mailbox Policy] in order to minimize disruption in the educational setting." (*Id.* ¶ 11.) Since the adoption of the Mailbox Policy in 1997, the School District "has not allowed distribution of state or national partisan campaign materials." (*Id.* ¶ 12.) In every election cycle, the School District reminds the union leadership of the Mailbox Policy and the unions have not previously challenged its enforcement. (*Id.* ¶ 13.)

In the fall of this year, LEAF attempted to place brochures concerning presidential candidate John Kerry in its members' School District mailboxes.[2] (McDowall Aff. ¶ 3, Ex. B.) In sum, the four-page brochure entitled "Education Minnesota presents John Kerry in Putting America Back on Track" contains two Kerry quotations, facts and figures on the No–Child Left Behind Act, jobs, and health insurance, and three statements about Kerry's positions on school funding, special education, and school vouchers. (*See id.* Ex. B.) It concludes by stating, "Education Minnesota, AFT, NEA and AFL–CIO all agree: When it comes to the knowledge, background and experience needed to lead America, John Kerry is the man to put America back on track." (*Id.*)

On September 30, 2004, Marsha McDowall, LEAF's Lead Grassroots Advocate, received an e-mail regarding the Mailbox Policy from the School District's Director of Administrative Services, Tom Coughlin.

---

2. The School District has 16 school buildings, 744 teachers (with an equal number of teacher mailboxes), and 346 educational assistants (most of whom do not have individual mailboxes). (Coughlin Aff. ¶ 17.)

(McDowall Aff. ¶ 3, Ex. A.) Coughlin's e-mail stated, in relevant part:

> I was notified ... that a LEAF rep was instructed to distribute a political flyer endorsing Kerry to members mailboxes. The rep. asked the principal if it was ok to do this. The principal then contacted me to get the correct interpretation on the school board policies concerning election activities. I believe I forwarded a set of the four different policies that pertain to elections earlier this month for your review/reference. This email is intended to remind the union leadership of the content of those policies so that ... no one gets in trouble....
>
> Policy D–160, Access to Employee mailboxes and School District Internal Mail Systems states, "No literature endorsing any political candidates or other similar political materials shall be distributed in employee mailboxes or in the school district's internal mail systems[.]"....
>
> .... I commend all of these policies for your study, understanding and compliance. Thank you for taking whatever action might be necessary to make sure your union is in compliance with these policies....

(*Id.* Ex. A.) From this e-mail, McDowall believed "that ignoring this directive could get me in trouble" and that if she "continued to distribute the literature, [she] would be disciplined." (*Id.* ¶ 3.) To date, no Kerry brochures have been distributed. (*Id.* ¶ 4.)

On October 7, 2004, the unions and the School District met to discuss the brochures and the Mailbox Policy, but they were unable to come to a resolution. (*Id.* ¶¶ 5–8.) On October 12, 2004, Plaintiffs sued the School District in Minnesota state court and the School District removed the case to this Court. In general, Plaintiffs allege that the Mailbox Policy violates (1) their free speech rights under the First and Fourteenth Amendments of the United States Constitution (as well as Article I,

Section 3 of the Minnesota Constitution) (Counts One and Two) and (2) their rights under Minnesota's Public Employee Labor Relations Act ("PELRA") (Count Three). Plaintiffs have moved for a Temporary Restraining Order, which this Court will construe as a preliminary injunction motion, *see supra* n. 1, to "require Defendant to allow the union to disseminate communications of its choosing to its members through the Defendant's internal mail box system[.]" (Pls.' Mem. at 1.)

## Standard of Review

■ Whether preliminary injunctive relief should be granted depends on an evaluation of the following factors: (1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest. *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir.1981); *see Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). A preliminary injunction is an extraordinary remedy, and the party seeking injunctive relief bears the burden of proving all the *Dataphase* factors. *Watkins*, 346 F.3d at 844. The likelihood of success on the merits is not determinative. *See Dataphase*, 640 F.2d at 113. Rather, a court must consider the particular circumstances of each case, remembering that, "[a]t base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id.*

## Analysis

### I. *Likelihood of Success on the Merits*

#### A. First Amendment Rights

The primary question presented in this case is whether the First Amendment, applicable to the States by virtue of the Fourteenth Amendment, is violated when

a school district enforces a policy that prohibits a teachers' union from distributing "literature endorsing any political candidate or other similar political materials" in teacher mailboxes or in the school district's internal mail systems.[3] After careful review of the applicable precedent from the United States Supreme Court, as well as the operative school district policy, this Court concludes that Plaintiffs have not shown a likelihood of success that the School District's Mailbox Policy is unconstitutional.

"The First Amendment's guarantee of free speech applies to teacher's mailboxes as surely as it does elsewhere within the school ... [b]ut this is not to say that the First Amendment requires equivalent access to all parts of a school building in which some form of communicative activity occurs." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 44, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (citations omitted). In fact, "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.,* 473 U.S. 788, 799–800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985) (citations omitted). "Accordingly, the extent to which the Government can control access depends on the nature of the relevant forum." *Id.* at 800, 105 S.Ct. 3439; *see Perry,* 460 U.S. at 44, 103 S.Ct. 948 ("The existence of a right of access to public property and the standard by which limitations upon such a right

must be evaluated differ depending on the character of the property at issue.").

The Supreme Court has identified three types of fora: the traditional public forum, the public forum created by government designation,[4] and the nonpublic forum. *Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439. First, traditional public fora are those places which " 'by long tradition or by government fiat have been devoted to assembly and debate.' " *Id.* (quoting *Perry,* 460 U.S. at 45, 103 S.Ct. 948). Public streets and parks fall into this category. *Id.* "The government can exclude a speaker from a traditional public forum 'only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest.' " *Arkansas Educ. Television Comm'n v. Forbes,* 523 U.S. 666, 677, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998) (quoting *Cornelius,* 473 U.S. at 800, 105 S.Ct. 3439); *see Perry,* 460 U.S. at 45, 103 S.Ct. 948.

Second, "a public forum may be created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439 (citing *Perry,* 460 U.S. at 45, 46 n. 7, 103 S.Ct. 948.) "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Id.* Courts "look[ ] to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly

---

**3.** At oral argument, this was the only issue discussed with any depth.

**4.** This type of forum has been referred to both as a "designated public forum" and a "limited public forum." *See Burnham v. Ianni,* 119 F.3d 668, 675 n. 11 (8th Cir.1997) (en banc).

Although there is some confusion as to which term should be used, *see Summum v. Callaghan,* 130 F.3d 906, 914–16, 916 n. 14 (10th Cir.1997), the Court will use the "designated public forum" term for convenience. *See, e.g., Forbes,* 523 U.S. at 667, 118 S.Ct. 1633 (referring to "designated public fora").

and debate as a public forum." *Id.* (citing *Perry*, 460 U.S. at 47, 103 S.Ct. 948). A designated public forum will not be found "in the face of clear evidence of a contrary intent," *id.* at 803, 105 S.Ct. 3439, and a nonpublic forum is not necessarily transformed into a public or designated forum even though the State engages in "selective access" by "allow[ing] some organizations ... to use the facilities." *Perry*, 460 U.S. at 47, 103 S.Ct. 948; *see Cornelius*, 473 U.S. at 805, 105 S.Ct. 3439 (reasoning that "selective access [to charities], unsupported by evidence of a purposeful designation for public use, [did] not create a public forum" (citation omitted)). A municipal auditorium and a city-leased theater designed for and dedicated to expressive activities fell into this category. *Cornelius*, 473 U.S. at 803, 105 S.Ct. 3439 (citing *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975)). Designated public forums are "bound by the same standards as apply in a traditional public forum"—"Reasonable time, place, and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest." *Perry*, 460 U.S. at 46, 103 S.Ct. 948 (citation omitted).

■ Finally, public property which is not by tradition or designation a forum for public communication is considered a nonpublic forum. *Cornelius*, 473 U.S. at 806, 105 S.Ct. 3439; *Perry*, 460 U.S. at 46, 103 S.Ct. 948. The government can restrict access to a nonpublic forum "as long as the restrictions are 'reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.'" *Cornelius*, 473 U.S. at 800, 105 S.Ct. 3439 (citing *Perry*, 460 U.S. at 46, 103 S.Ct. 948).

■ Here, the School District's teacher mailboxes and internal mail systems are nonpublic fora. *See Perry*, 460 U.S. at 46, 103 S.Ct. 948 (holding, in a similar case, that "[t]he school mail facilities here at issue fall within" the nonpublic category). Plaintiffs argue, without explanation, that the mailboxes are a "limited public forum ... '[that] is bound by the same standards as apply in a traditional public forum. Reasonable time, place and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest.'" (Pls.' Mem. at 7 (citing *Perry*, 460 U.S. at 46, 103 S.Ct. 948).) Although the Court uses the term "designated public forum" instead of "limited public forum," *see supra* n. 4, whatever one calls it, the standard articulated by Plaintiffs does not apply here. There is no evidence in the record that the School District intentionally opened the mailboxes for public discourse. In fact, the Mailbox Policy reveals a contrary intent: it specifically reserves the mailboxes for "school district related business," open to nonschool persons only upon the prior approval of the superintendent and open to union representatives only "on matters within the scope of the official representational duties of the unions," and prohibits "literature endorsing any political candidate or other similar political materials." Furthermore, this selective access to the mailboxes does not turn them into traditional public or designated public fora. *See Cornelius*, 473 U.S. at 805, 105 S.Ct. 3439; *Perry*, 460 U.S. at 47, 103 S.Ct. 948. In the face of this clear evidence of a contrary intent, the Court concludes that the mailboxes and internal mail facilities are nonpublic fora. *See Cornelius*, 473 U.S. at 803, 105 S.Ct. 3439; *Perry*, 460 U.S. at 46–49, 103 S.Ct. 948.

Having determined that the mailboxes and internal mail facilities are nonpublic fora, the Court must then evaluate the Mailbox Policy under the appropriate standard. In contrast to a traditional or desig-

nated public forum, "[c]ontrol over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius,* 473 U.S. at 806, 105 S.Ct. 3439 (citing *Perry,* 460 U.S. at 49, 103 S.Ct. 948). Said differently, "a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum," but "the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includable subject." *Id.* (citations omitted). "Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity.... The touchstone for evaluating these distinctions is whether they are reasonable in light of the purpose which the forum at issue serves." *Perry,* 460 U.S. at 49, 103 S.Ct. 948 (footnote omitted). "The Government's decision to restrict access to a nonpublic forum need only be *reasonable;* it need not be the most reasonable or the only reasonable limitation." *Cornelius,* 473 U.S. at 808, 105 S.Ct. 3439 (emphasis in original).

The School District's Mailbox Policy is reasonable, in light of the purposes of the mailboxes and internal mail systems, and is viewpoint neutral. First, there is no allegation, or evidence, that the Mailbox Policy denies access on the basis of the Plaintiffs' viewpoint. In fact, at oral argument Plaintiffs' counsel conceded that the Mailbox Policy is viewpoint neutral. (Audio Tape: Oral Argument (10/20/04).) Second, part of the Mailbox Policy's purpose is "to provide for access

to employee mailboxes and the school district's internal mail systems, taking into consideration the educational objectives and responsibilities of the school district." (Coughlin Aff. Ex. A.) Its restriction of "literature endorsing any political candidate or other similar political materials" (*id.*) is reasonable in light of this purpose because it is wholly consistent with the School District's legitimate interest in "preserv[ing] the property ... for the use to which it is lawfully dedicated," *Perry,* 460 U.S. at 50–51, 103 S.Ct. 948 (citation and internal quotations omitted), i.e., "school district related business" (Coughlin Aff. Ex. A). "[W]hen government property is not dedicated to open communication the government may—without further justification—restrict use to those who participate in the forum's official business." *Perry,* 460 U.S. at 53, 103 S.Ct. 948 (footnote omitted). "Moreover, avoiding the appearance of political favoritism is a valid justification for limiting speech in a nonpublic forum." *Cornelius,* 473 U.S. at 809, 105 S.Ct. 3439 (citations omitted). Finally, the reasonableness of the limitations on Plaintiffs' access to the mailboxes and internal mail systems is also supported by the substantial alternative channels that remain open for union-teacher communication to take place. *See Perry,* 460 U.S. at 53, 103 S.Ct. 948. Here, as in *Perry,* 460 U.S. at 53–54, 103 S.Ct. 948, and *Cornelius,* 473 U.S. at 809, 105 S.Ct. 3439, Plaintiffs have access to alternative channels, including direct mail, its Internet website, and in-person solicitation outside the School District's mailboxes. Accordingly, Plaintiffs are unlikely to succeed in showing that the School District's Mailbox Policy in this nonpublic forum violates the First Amendment.[5]

**5.** At oral argument, Plaintiffs' counsel repeatedly argued that once the School District opened up the mailboxes to Plaintiffs, it could not place content-based restrictions upon them, unless it had a compelling interest. (Audio Tape: Oral Argument (10/20/04).) Counsel cited four cases in support: *Ysleta Fed'n of Teachers v. Ysleta Indep. Sch. Dist.,*

Next, Plaintiffs assert that the Mailbox Policy violates the standards articulated in *Pickering v. Bd. of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) and *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), which "appl[y] to determinations of whether a public employer has properly discharged or disciplined an employee for engaging in speech," *Burnham v. Ianni*, 119 F.3d 668, 678 (8th Cir.1997) (en banc) (citations omitted); (*see* Pls.' Mem. at 5–6). Courts evaluating claims by public employees who allege discharge or discipline in derogation of their First Amendment rights must engage in a two-step inquiry. *Barnard v. Jackson County*, 43 F.3d 1218, 1223 (8th Cir.1995). "First, courts must determine whether the employee's speech can be fairly characterized as constituting speech on a matter of public concern." *Id.* (citations and internal quotations); *Connick*, 461 U.S. at 146, 103 S.Ct. 1684. If so, the second inquiry involves balancing the employee's right to free speech against the interests of the state. *Barnard*, 43 F.3d at 1223. Courts must strike " 'a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' " *Id.* (quoting *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731).

Assuming the speech at issue is a matter of public concern, Plaintiffs have not demonstrated a likelihood of success that their interests outweigh the School District's. To begin, Plaintiffs do not contend that they were threatened with discipline for "engaging in speech." *Burnham*, 119 F.3d at 678. Rather, they contend they were "threatened that those that *violated the [Mailbox Policy]* would get into trouble." (Pls.' Mem. at 2; *see* McDowall Aff. ¶ 2.) In addition, Plaintiffs have cited no case in which a court has found that a public employer violates the First Amendment by threatening to discipline those who would breach a valid nonpublic forum speech restriction. To the Court's way of thinking, this could not be the law—rather, if the Mailbox Policy is valid under *Perry* and *Cornelius*, then the School District cannot

---

720 F.2d 1429 (5th Cir.1983); *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 777 F.2d 1046 (5th Cir.1985); *Burnham*, 119 F.3d 668; and *Davidson v. Community Consol. Sch. Dist. 181*, 130 F.3d 265 (7th Cir. 1997). This argument is without merit. Plaintiffs have not demonstrated that the mailboxes are anything other than nonpublic fora and, as stated above, access to nonpublic fora "can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius*, 473 U.S. at 806, 105 S.Ct. 3439. There is no "requirement that the restriction be narrowly tailored or that the Government's interest be compelling." *Id.* at 809, 105 S.Ct. 3439. Furthermore, Plaintiffs' reliance on the cited authority is misplaced. First, the Fifth Circuit has recognized that *Ysleta's* narrow interpretation of *Perry* is an outlier. *See Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 350 (5th Cir.2001). Second, despite Plaintiffs' assertions to the contrary, the *Garland* court found that the selective access of certain groups did not transform the school's mail system into an open public forum. 777 F.2d at 1052–53; *see Chiu*, 260 F.3d at 350. Although the *Burnham* court stated that "once [the state university] chose to open the [display] case, it was prevented from unreasonably distinguishing among the types of speech it would allow within the forum," 119 F.3d at 676, close examination clearly reveals that the court was applying the reasonableness and viewpoint neutrality standard to the forum at issue. Not only does the court cite the text of a Supreme Court decision that sets out this standard, *see id.* (citing *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 392–93, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993)), the court also applied this standard later on in the case. Finally, the *Davidson* court applied the reasonableness and viewpoint neutrality standard to a school district's internal mail system. 130 F.3d at 268–69.

violate the First Amendment by threatening to enforce it. *See also Barnard,* 43 F.3d at 1224 ("As an employer, a governmental body enjoys a legitimate interest in promot[ing] efficiency and integrity in the discharge of official duties, and [in] maintain[ing] proper discipline in the public service.") (citation and internal quotations omitted) (alterations in original).

Finally, Plaintiffs contend that the Mailbox Policy is unconstitutionally vague or overbroad. (Pls.' Mem. at 8–10.) Both claims are unlikely to succeed. First, there is no question that the Kerry brochure falls under the Mailbox Policy's prohibition on "literature endorsing any political candidate or other similar political materials." (Coughlin Aff. Ex. A.) As such, Plaintiffs' vagueness argument is less than compelling. While Plaintiffs attempt to argue that the phrase "or other similar political materials" is unconstitutionally vague, the Court disagrees. This phrase follows the previous phrase "literature endorsing any political candidate." "Political materials" is defined as "any paper, handbill, poster, booklet, brochure, advertisement, sample ballot, display, or audio or video presentation." (*Id.*) Clearly, by virtue of its position within the sentence and the manner in which it is defined, the phrase "or other similar political materials" expands the word "literature" to encompass the variety of *formats* in which endorsements of political candidates are prohibited from being placed in teacher mailboxes. Properly viewed, the Court cannot say that it is likely that this portion of the Mailbox Policy is unconstitutionally vague.

Second, a finding of overbreadth is "strong medicine" to be used "sparingly and only as a last resort." *Broadrick v. Oklahoma,* 413 U.S. 601, 613, 93 S.Ct.

2908, 37 L.Ed.2d 830 (1973). For the Mailbox Policy to be facially challenged on overbreadth grounds, "there must be a realistic danger that the [Mailbox Policy] itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Members of the City Council v. Taxpayers For Vincent,* 466 U.S. 789, 801, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (citations omitted). It is unlikely that the "strong medicine" of an overbreadth finding is warranted here. Plaintiffs have shown no realistic danger that the Mailbox Policy will significantly compromise the First Amendment protections of others.

## B. Labor Rights Under PELRA and National Labor Relations Act

Another question presented in this case is whether the School District's Mailbox Policy violates Minnesota's Public Employment Labor Relations Act ("PELRA"). PELRA sets out numerous provisions designed "to promote orderly and constructive relationships between all public employers and their employees." Minn.Stat. § 179A.01. Plaintiffs assert that the School District has violated two PELRA provisions: (1) § 179A.06, subd. 1 and (2) § 179A.13, subd. 2. (Pls.' Mem. at 3–4.) They also assert a violation of the National Labor Relations Act ("NLRA"). (*Id.*) The Court will examine each in turn.

First, § 179A.06, subd. 1 provides that PELRA does "not affect the right of any public employee or the employee's representative to express or communicate a view, grievance, complaint, or opinion on any matter related to the conditions or compensation of public employment or their betterment." Minn.Stat. § 179A.06, subd. 1. Construing an analogous predecessor to this provision,[6] the Minnesota

---

**6.** The statute previously read: "Nothing contained in sections 179.61 to 179.76 shall be construed to limit, impair or affect the right

of any public employee or his representative to the expression or communication of a view, grievance, complaint or opinion on any mat-

Supreme Court declined to "read this section as conferring any additional right on public employees but rather as a taking note of the existence of rights outside the PELRA which the legislature in no way intended to limit by the creation of new rights in the Act." *Finch v. Wemlinger,* 310 N.W.2d 66, 68 (Minn.1981). As this section of PELRA provides Plaintiffs with no additional rights, Plaintiffs have not shown a likelihood of success that it can use this provision to overcome the Mailbox Policy's valid nonpublic forum speech restrictions.

Second, § 179A.13, subd 2 prohibits public employers from "interfering, restraining, or coercing employees in the exercise of the rights guaranteed" by PELRA and from "dominating or interfering with the formation, existence, or administration of any employee organization or contributing other support to it." Minn.Stat. § 179A.13, subd. 2(1), (2). With respect to the former, Plaintiffs have failed to identify the exercise of *any* right under PELRA in which the School District has interfered, restrained, or coerced. Needless to say, they are therefore unlikely to succeed. With respect to the latter, Plaintiffs have similarly failed to identify *any* dominance or interference by the School District with the formation, existence, or administration of any employee organization. As such, success on this issue is also unlikely.

Finally, relying upon *Eastex, Inc. v. NLRB,* 437 U.S. 556, 98 S.Ct. 2505, 57 L.Ed.2d 428 (1978), Plaintiffs assert that their rights under the NLRA have been violated. (*See* Pls.' Mem. at 4–5.) In *Eastex,* the Supreme Court upheld a National Labor Relations Board ("NLRB") determination that an employer committed an unfair labor practice when it banned employee distribution of a newsletter criticizing a proposal to incorporate a "right to work" provision into the state constitution and a Presidential veto of a federal minimum wage increase. *See* 437 U.S. at 563, 570, 575–76, 98 S.Ct. 2505; *Local 174, Int'l Union, United Automobile, Aerospace and Agricultural Implement Workers of America, (UAW) v. NLRB,* 645 F.2d 1151, 1153 (D.C.Cir.1981) (*"Local 174"*). The Supreme Court ruled that characterization of the "right to work" laws and minimum wage levels as political issues did not remove distribution of the newsletter from shelter under the "mutual aid or protection" clause of NLRA § 7.[7] *Eastex,* 437 U.S. at 570 n. 20, 98 S.Ct. 2505; *Local 174,* 645 F.2d at 1153. That clause, according to the Court, encompasses employee endeavors to improve terms and conditions of employment, or the well-being of workers outside the immediate employee-employer relationship. *Eastex,* 437 U.S. at 565–67, 98 S.Ct. 2505; *Local 174,* 645 F.2d at 1153–54.

Although they provide little substantive argument on the issue, Plaintiffs allege that distributing the Kerry brochure "is clearly protected [under NLRA § 7] in that it deals directly with issues related to the conditions of employment of the members and how they can make them better." (Pls.' Mem. at 4.) The Court cannot agree.

---

ter related to the conditions or compensation of public employment or their betterment." *Finch,* 310 N.W.2d at 68.

7. Section 7 of the NLRA, as set forth in 29 U.S.C. § 157, provides in full:

   Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

"[T]he range of § 7's 'mutual aid or protection' clause ... is not infinite" and at some point "the relationship of a proposed activity to the employees' interests as employees 'becomes so attenuated that [the] activity cannot fairly be deemed to come within the ... clause.'" *Local 174*, 645 F.2d at 1154 (quoting *Eastex*, 437 U.S. at 567–68, 98 S.Ct. 2505) (alteration in original). Such an attenuation has been found when "the principal thrust of the [union or employee communication] was to induce employees to vote for specific candidates, not to educate them on political issues relevant to their employment conditions." *Id.* Here, Plaintiffs are unlikely to succeed in showing that the School District violated NLRA § 7 because they have failed to demonstrate that the "principal thrust" of their Kerry brochure was to educate teachers and educational assistants on political issues relevant to their employment conditions, and *not* to induce them to vote for Kerry.

### C. Likelihood of Success Summary

Given the foregoing, Plaintiffs have not shown a likelihood of success on the merits of either their First Amendment or labor law claims.

## II. Irreparable Harm

" 'The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.' Thus, to warrant ... preliminary [injunctive relief], the moving party must demonstrate a sufficient threat of irreparable harm." *Bandag, Inc. v. Jack's Tire & Oil, Inc.*, 190 F.3d 924, 926 (8th Cir.1999) (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959)); *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371 (8th Cir.1991).

Relying on *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion), Plaintiffs assert that if

they are not permitted to distribute the Kerry brochure through its members' mailboxes, then they will be irreparably harmed. (Pls.' Mem. at 11.) Although the plurality in *Elrod* stated that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," 427 U.S. at 373, 96 S.Ct. 2673 (citation omitted), Plaintiffs have not shown irreparable harm in this case. Under the Eighth Circuit's interpretation of *Elrod*, irreparable harm exists "[i]f [the plaintiffs] *are correct and their First Amendment rights have been violated.*" *Marcus v. Iowa Public Television*, 97 F.3d 1137, 1140–41 (8th Cir.1996) (emphasis added). But because Plaintiffs have not shown that their First Amendment rights have been violated, *see supra* Analysis Part I.A, the Court cannot say that they have "demonstrate[d] a sufficient threat of irreparable harm," *Bandag*, 190 F.3d at 926. Furthermore, Plaintiffs have not shown "a loss of First Amendment freedoms." *Elrod*, 427 U.S. at 373, 96 S.Ct. 2673. There is no dispute that alternative avenues for Plaintiffs' speech exist through direct mailing, in-person solicitation, telephone calls, and the like. As noted in *Cornelius*, "[t]he First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message." 473 U.S. at 809, 105 S.Ct. 3439 (citation omitted). Accordingly, Plaintiffs have not shown irreparable harm.

## III. Balance of Hardships and the Public Interest

Finally, the Court assesses the balance of hardships and the public interest. First, the potential harm to Plaintiffs in the absence of injunctive relief does not outweigh the harm to the School District that might result from its grant. Plaintiffs' hardship would be the inability to

disseminate Kerry brochures to its members through the employee mailboxes. This hardship is tempered, however, by the alternative channels in which Plaintiffs can disseminate their message. In contrast, the School District's hardship would be more serious. By opening access to the mailboxes as Plaintiffs desire, the School District's interests in keeping teacher mailboxes as a nonpublic forum—and its corresponding ability to control access based on subject matter and speaker identity, *see Cornelius,* 473 U.S. at 806, 105 S.Ct. 3439—would be lost. Moreover, allowing Kerry brochures to be disseminated in the teacher mailboxes may jeopardize the School District's interests in political neutrality, as "avoiding the appearance of political favoritism is a valid justification for limiting speech in a nonpublic forum." *Id.* at 809, 105 S.Ct. 3439 (citations omitted). Second, and for reasons expressed above, granting the injunction would also harm the public interest. Accordingly, these final two factors tilt towards the School District.

### IV. Summary

In sum, Plaintiffs have not borne their burden of proving all the *Dataphase* factors listed above. *Watkins,* 346 F.3d at 844. Because none of the four factors favors issuing an injunction, the Court will deny Plaintiffs' Motion.

### Conclusion

Based on the foregoing and all of the files, records, and proceedings herein, **IT IS ORDERED** that Plaintiffs' Motion for a Temporary Restraining Order (Doc. No. 3) is **DENIED.**[8]

---

8. In accordance with Fed.R.Civ.P. 52(a), the foregoing Memorandum Opinion and Order are the Court's findings of fact and conclu-

sions of law that constitute the grounds of its action.